Sweeney v City of New York (2004 NY Slip Op 24196)

Sweeney v City of New York

2004 NY Slip Op 24196 [4 Misc 3d 834]

May 24, 2004

Supreme Court, Kings County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, November 3, 2004

[*1]
Robert L. Sweeney, Plaintiff,
v
City of New York et al., Defendants.
Supreme Court, Kings County, May 24, 2004

APPEARANCES OF COUNSEL

Kenny, Stearns & Zonghetti, New York City, for Reinauer Transportation Companies, L.P., defendant. Rubin, Fiorella & Friedman, New York City, for City of New York, defendant. Capiello, Hofman & Katz, New York City, for plaintiff.

{**4 Misc 3d at 835} OPINION OF THE COURT

Mark Partnow, J.
Defendants Reicon Group LLC and Reinauer Transportation Companies, L.P. move for summary judgment pursuant to CPLR 3212 dismissing all causes of action against them.
On April 17, 2001, plaintiff was allegedly employed as a dock builder by Reicon, a marine construction contractor, and was working as a dive tender aboard the CB Bergen, a stationary work barge owned by Reinauer, in connection with a pier demolition/rehabilitation contract Reicon was performing for the City of New York at the Department of Sanitation Marine Transfer Station located at 31st Avenue in College Point, New York. While plaintiff was throwing a line to the marine diver he was assisting, he slipped and fell forward, injuring his left knee and hand. He testified at his deposition that he slipped because the deck of the vessel was "wet" and "slippery" from either rain that fell that day, hydraulic fluid and/or diesel oil that spilled on the deck, and/or water that had accumulated in the area from the tool retrieval line he had thrown to the diver "numerous" times.
[*2]
Plaintiff commenced the instant action against the City of New York, Reicon, and Reinauer alleging violations of Labor Law § 240 (1), §§ 200 and 241 (6) against all defendants, and violations of 33 USC § 905 (b) and § 933 (the Longshore and Harbor Workers' Compensation Act [LHWCA]) against Reicon and Reinauer for "vessel negligence." In his bill of particulars, plaintiff alleges that "because of the absence of a functional non-skid coating on the deck of the vessel, the deck was rendered additionally slippery, hazardous and unsafe . . . ."
In support of their motion to dismiss the complaint insofar as asserted against them, defendants argue that plaintiff's LHWCA claim is barred by the exclusive remedy of workers' compensation payments, which plaintiff received from Reinauer's workers' compensation insurer (see 33 USC §§ 904, 905 [a]). Defendants also contend that Reinauer is not liable to plaintiff under the LHWCA for negligence of the vessel pursuant to 33 USC § 905 (b) because it was not negligent in its capacity as vessel owner.
"Pursuant to the LHWCA, a maritime worker injured in the course of employment is entitled to workers' compensation benefits {**4 Misc 3d at 836}from his or her employer" (Sutherland v City of New York, 266 AD2d 373, 377 [1999]; 33 USC § 904). "A claim for compensation benefits is the worker's exclusive remedy against the employer" (id. at 377). However, under section 905 (b) of the LHWCA, an injured maritime worker may maintain an action against a vessel owner for its negligence (id.; 33 USC § 905 [b]).[FN1]

"Thus, where the employer and the vessel owner are independent entities, the worker may obtain the statutory benefits from his or her employer and also recover damages resulting from the owner's negligence, subject to a worker's compensation lien" (id. at 377). In addition,
"[i]n Jones & Laughlin Steel Corp. v Pfeifer (462 US 523), the United States Supreme Court held that 33 USC § 905 (b) authorizes a negligence action against a vessel even where . . . the owner is also the worker's employer. In a footnote, the Court stated that the statute makes it clear that under such circumstances, the vessel owner is liable only for negligence in its owner capacity, not for negligence in its employer capacity" (id. at 377, citing Jones & Laughlin Steel Corp., 462 US at 531 n 6).
"In determining whether the provisions of the LHWCA may be invoked, an employer must establish that the injured party was engaged in maritime employment at the time of the injury and that he was performing these duties on navigable waters" (Colamarino v City of New York, 166 AD2d 404, 406 [1990]). Here, plaintiff alleges, and it is undisputed, that he was an "employee" within the meaning of the LHWCA at the time the accident occurred (see, 33 USC § 902 [3]). In this regard, plaintiff testified that at the time of the incident he was aiding a marine diver who was building a dock, which is a traditional maritime activity (see McDonald v City of New York, 231 AD2d 556, 557 [1996]). Moreover, plaintiff was performing his duties on navigable waters since the vessel was resting in a river bed secured by large pipes through its hull and "soft lines" for extra security.
As to the viability of plaintiff's cause of action pursuant 33 USC § 905 (b), as noted, defendants argue that, as plaintiff's employers, their liability under the LHWCA is limited to payment{**4 Misc 3d at 837} of workers' compensation benefits to plaintiff. In support of their claim that they are plaintiff's employers, defendants argue that plaintiff pleaded in his verified complaint that he was employed by both defendants at the time of the accident. Defendants also assert that immunity under the [*3]LHWCA applies based upon their parent/subsidiary relationship, which establishes that they acted as a "single entity."
As an initial matter, as plaintiff properly recognizes, even assuming Reinauer is found to be his employer, liability may nevertheless lie against Reinauer based upon its status as owner of the barge pursuant to section 905 (b) of the LHWCA. In any event, on the merits, a question of fact exists as to whether Reinauer was plaintiff's employer. First, it is true that plaintiff pleaded in his verified complaint that he was employed by both defendants when the accident occurred, which constitutes a conclusive judicial admission (People v Brown, 98 NY2d 226, 232-233 [2002]; Stauber v Brookhaven Natl. Lab., 256 AD2d 570, 571 [1998]; Prince, Richardson on Evidence § 216 [Farrell 11th ed]). In this regard, if a party makes an untrue admission in his pleadings or enters into a false stipulation of facts through inadvertence or mistake, the court will generally grant permission to amend the pleading or withdraw the stipulation on good cause and in the furtherance of justice. However, courts are reluctant to grant such relief when the opposing party, having relied or acted upon the formal judicial admission, would thereby be prejudiced (5 Bender's New York Evidence § 16.06). Here, plaintiff does not assert that he made an untrue admission, nor has he moved to amend the complaint. Nevertheless, there is no indication that defendants have relied or acted upon this admission to their prejudice. In addition, the record reveals that a question of fact exists as to whether Reinauer is plaintiff's employer. For the foregoing reasons, and in the exercise of its interest of justice jurisdiction, the court declines to ascribe dispositive import to these statements.
As to whether Reinauer is plaintiff's employer, immunity under the LHWCA, which is based upon this State's Workers' Compensation Law, applies " 'whether the relationship between two corporate entities is that of joint venturers, parent and subsidiary, corporate affiliates, or general and special employers' " (Claudio v United States, 907 F Supp 581, 587 [1995], quoting Levine v Lee's Pontiac, 203 AD2d 259 [1994]). In particular, "the coordinated activity of a parent and its wholly owned subsidiary" has been likened to the "activity of a single enterprise"{**4 Misc 3d at 838} (id. at 588). "Generally, a parent corporation may be deemed to be the employer of an employee of a subsidiary corporation for workers' compensation purposes if the subsidiary functions merely as the alter ego of the parent" (Ploszaj v Cooper Tank & Welding Corp., 213 AD2d 385, 386 [1995]). "For a subsidiary corporation to be considered the alter ego of the parent corporation, 'there must be direct intervention by the parent in the management of the subsidiary to such an extent that "the subsidiary's paraphernalia of incorporation, directors and officers" are completely ignored' " (Shelley v Flow Intl. Corp., 283 AD2d 958, 960 [2001], lv dismissed 96 NY2d 937 [2001], quoting Billy v Consolidated Mach. Tool Corp., 51 NY2d 152, 163 [1980], rearg denied 52 NY2d 829 [1980], quoting Lowendahl v Baltimore & Ohio R.R. Co., 247 App Div 144, 155 [1936], affd 272 NY 360 [1936], rearg denied 273 NY 584 [1937]). Moreover, " '[t]he parent corporation must exercise complete domination and control of the subsidiary's everyday operations' " (Smith v Roman Catholic Diocese, 252 AD2d 805, 806 [1998], quoting Allen v Oberdorfer Foundries, 192 AD2d 1077, 1078 [1993]).
In determining whether separate companies operate as a single entity, courts consider, inter alia, whether there is common ownership, common management, interrelation of operations, and centralized control of labor relations (Madi v United Parcel Serv. Gen. Servs. Co., 1999 WL 771389, *4, 1999 US Dist LEXIS 14948, *13-14 [SD NY, Sept. 29, 1999]). Consideration is also given as to whether the corporations share operational losses or profits or if they are financially insulated from one another (id.; see Buchner v Pines Hotel, 87 AD2d 691, 692 [1982], affd 58 NY2d 1019 [1983]).
[*4]
Here, plaintiff testified that he alleged in the complaint that both Reinauer and Reicon were his employers because he received his paychecks from Reicon, but that Reinauer "had control" over Reicon. Mr. Jeffrey Wollman, a vice-president of Reinauer Group, which includes both defendants and another corporation not a party to this action, testified that "Reinauer is the parent company and Reicon is another offshoot company within Reinauer"; that Reinauer was in the oil transportation business and Reicon was in the marine construction business; and that the two corporations share common officers, directors and the same office. In his sworn affidavit, Mr. Wollman states, inter alia, that Reicon is a wholly owned subsidiary of Reinauer; that he is responsible for supervising and managing the day-to-day operations of Reicon's marine construction business; and that {**4 Misc 3d at 839}Reicon is named as an additional insured on the workers' compensation insurance policy issued to Reinauer. In addition, he asserts that in October 2000, Reinauer purchased the CB Bergena crane barge that was constructed for and purchased specifically for the purpose of being used to further the marine construction business of Reiconand that Reinauer turned it over to Reicon in October 2000 for exclusive use by Reicon in its marine construction work. Based upon the foregoing, Reinauer contends that as the parent company of Reicon, it is immune from liability as a result of having paid workers' compensation benefits to plaintiff pursuant to the LHWCA.
In opposition, plaintiff asserts that questions of fact exist as to Reinauer's employer status. In this regard, plaintiff notes that three of his supervisors were employees of Reicon and that he was paid by Reicon. He also argues that Reicon's "set up" as a "separate, specialist dock building company" suggests that Reicon was his employer. In addition, he states that Reicon existed as a distinct entity to enable it to hire labor which Reinauer, due to a collective bargaining agreement with another union, was unable to do. Plaintiff contends that if defendants were essentially the same corporation, the labor pool from which the two corporations procured workers would not be distinct, as it was when the accident occurred.
While defendants have submitted evidence demonstrating that they are closely related, a question of fact exists as to whether Reicon is the alter ego of Reinauer such that Reinauer may be considered plaintiff's employer. In this regard, although Mr. Wollman testified that the two corporations share officers, directors and an office, and that Reinauer held the policy which paid plaintiff his compensation benefits, Mr. Wollman's testimony establishes that Reinauer was in the oil transportation business and Reicon was in the marine construction business, suggesting separate corporate entities (see Longshore v Paul Davis Sys. of Capital Dist., 304 AD2d 964, 965 [2003]). In addition, Mr. Wollman testified that when Reicon was first incorporated, it was a division of Reinauer, but that at some point in time it became a separate entity. In addition, Mr. Wollman failed to address in his affidavit whether or not Reicon and Reinauer shared or allocated operational profits and losses. In this regard,{**4 Misc 3d at 840} there is no indication as to whether the two defendants filed separate tax returns or financial statements.[FN2]

[*5]
Finally, it is true that workers' compensation benefits were paid through a policy issued to Reinauer, suggesting Reinauer was plaintiff's employer. However, the insurance policy named Reicon as an additional insured. In addition, only employees of Reicon supervised plaintiff on the job, and plaintiff was paid by Reicon, suggesting Reicon was plaintiff's employer.
As discussed above, despite the existence of a question of fact as to whether Reinauer was plaintiff's employer, liability may lie against Reinauer pursuant to 33 USC § 905 (b) for "vessel negligence"[FN3]

as the owner of the barge. Under section 905 (b), in accordance with section 933, an employee may bring an action in negligence against the "vessel as a third party." In particular, in Scindia Steam Nav. Co. v De Los Santos (451 US 156 [1981]):
"[T]he Supreme Court considered the duty of care that a vessel owner owed to an injured longshore worker who was employed by an independent stevedoring firm. For this common triangular relationship at leastvessel, stevedore, and longshore workerthe Court held that limiting the vessel's duty of care so as to put the chief responsibility upon the independent stevedore was consistent with Congress' intent to permit third-party negligence actions {**4 Misc 3d at 841}against the vessel but to eliminate the vessel's no-fault liability (the 'unseaworthiness' claim). In Howlett, a case that also involved a longshore worker suing an independent vessel, the Court restated the vessel's limited residual duties:
"The first, which courts have come to call the 'turnover duty,' relates to the condition of the ship upon the commencement of stevedoring operations . . . The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.' . . . The third duty, called the[*6]'duty to intervene,' concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore" (Morehead v Atkinson-Kiewit, J/V, 97 F3d 603, 608-609 [1st Cir 1996], citing Howlett v Birkdale Shipping Co., S.A., 512 US 92, 98; see also Scindia Steam Nav. Co. v De Los Santos, 451 US 156, 167-168 [1981]; Manuel v Cameron Offshore Boats, Inc., 103 F3d 31, 33-34 [1997]).[FN4]

The turnover duty, which is implicated here, requires the vessel to 
" 'exercise ordinary care under the circumstances' to turn over the ship and its equipment and appliances 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and property' " (Howlett, 512 US at 98, quoting Federal Mar. Terms., Inc. v Burnside Shipping Co., 394 US 404, 416-417 n 18 [1969]). 
"A corollary to the turnover duty requires the vessel to warn the stevedore 'of any hazards on the ship or with respect to its equipment,' so long as the hazards 'are known to the vessel or should be known to it in the exercise of reasonable care,' and 'would likely be encountered by the stevedore in the course of {**4 Misc 3d at 842}his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work' " (id. at 98). 
Stated otherwise, the second component of the turnover duty does not require a vessel owner to warn a stevedore/marine contractor of obvious and avoidable dangers on a ship (see Sinagra v Atlantic Ocean Shipping, Ltd., 182 F Supp 2d 294, 301 [ED NY 2001]).
On the other hand, where the employer of an injured harbor worker is also the owner of the vessel; namely, a "dual-capacity" defendant, and the harbor worker sues the employer/vessel owner for vessel negligence, "a vessel owner acting as its own stevedore is liable only for negligence in its 'owner' capacity, not for negligence in its 'stevedore' capacity" (Jones & Laughlin Steel Corp., 462 US at 531 n 6). In dual-capacity cases, "the court's task is to analyze the allegedly negligent conduct to determine whether that conduct was performed in the course of the operation of the owner's vessel as a vessel or whether the conduct was performed in furtherance of the employer's harbor-working operations" (Gravatt v City of New York, 226 F3d 108, 125 [2000]). The Scindia duties of care apply to dual-capacity cases to the extent the facts allow (id.; see also Morehead, 97 F3d at 613).
Relying in large part upon Mr. Wollman's testimony and affidavit, defendants argue that Reinauer may not be held liable as a vessel owner under section 905 (b) since the barge had "effectively" been turned over to Reicon by Reinauer long before the accident occurred. Assuming Reinauer is found to be plaintiff's employer, defendants contend that there is no dual-capacity liability since the [*7]barge was being used exclusively for marine construction activities, rather than as a vessel, at the time of the alleged accident.
Plaintiff opposes, contending that Reinauer is liable for vessel negligence under section 905 (b) since it breached the first two Scindia duties of care, whether it was acting in its dual-capacity status as vessel owner, or whether it was a mere vessel owner. Specifically, plaintiff argues that it was Reinauer, and not Reicon, that applied the allegedly defective paint, and thus it was Reinauer which turned over the barge to the dock workers in an unsafe condition. Plaintiff also contends that Mr. Wollman, as "[v]ice [p]resident of a marine tug and barge operations company that operated its own shipyard and fleet of vessels,"{**4 Misc 3d at 843} breached Reinauer's corollary duty to warn his "subordinates" of the inadequacy of the deck covering. Plaintiff submits the affidavit of Mr. John Tylawsky, P.E., an expert in the field of engineering, who opines, inter alia, that the accident resulted from improper "nonskid" compounds added to the barge deck paint which did not provide adequate traction; that it was customary in the industry for the vessel owner to provide a suitable nonskid deck coating in the working and walking areas of barges used as work platforms; and that the failure to provide the deck with proper nonskid "attributes" caused the barge to be unreasonably dangerous.
Plaintiff also maintains that Reinauer breached its "active operations" duty because Mr. Wollman, a Reinauer vice-president, was the on-site project supervisor who had significant control over and directed all aspects of the project, and failed to correct the nonfunctional deck coating.
Evidence in the record on this issue is that Mr. Wollman testified that Reinauer is in the oil transportation business and that Reicon is in the marine construction business. He stated that at the time of the accident, Reinauer was the owner of the CB Bergen. In his sworn affidavit, Mr. Wollman asserts that the bargepurchased in October 2000is a crane barge constructed and purchased specifically for marine construction, which has never been used by Reinauer as part of its marine transportation business.
Mr. Wollman testified that when Reinauer turned over the brand new vessel to Reicon, it was obvious to Mr. Wollman, as an experienced marine contractor, that the deck had not been painted with nonskid paint and that it needed to be. As such, union dock workers employed by Reicon painted the deck of the vessel with nonskid paint on or about October 21, 2000 in Reicon's yard, located at 1983 Richmond Terrace in Staten Island.
According to Mr. Wollman, after Reicon outfitted the vessel, a Reinauer tugboat transported it for Reicon from Reicon's yard to the work site at the Department of Sanitation Marine Transfer Station. Once the vessel arrived there, Reinauer did not have any further involvement with the vessel. Mr. Wollman states in his affidavit that the CB Bergen has never been operated as a manned barge and that Reicon had exclusive possession, use and control of the barge, which was utilized solely as a work platform for dock building purposes.
Plaintiff testified that, at the time of his accident, he was a member of a dock builder's union; that the project on which he was {**4 Misc 3d at 844}working when injured was a dock building project that included driving piles, replacing the wood fendering system, replacing the hardware that held various members of the dock in place, and replacing decking, i.e., the walking surface of the dock; that he was working as a dive tender assisting his supervisor, a marine diver, by supplying him with building materials and tools; and that he was supervised by Mr. Barcavage, Mr. Wollman and others, who were all Reicon employees.
Plaintiff also stated that working with a barge like the CB Bergen was common to the dock building business; that the barge allowed dock builders to access [*8]the water side of the pier and gave divers a staging platform from which to work; that the vessel was used "as a platform for dock building materials," as well as a platform for the dock builders to cut lumber used by the divers; and that the vessel contained a crane, which was used in conjunction with the dock building, and housed two containers, one used as a storage shed for tools and equipment and the other as a shanty for the crew. Plaintiff testified that from the time the vessel was brought to the job site it remained there continuously until the date of his accident, and that it was not used for transportation purposes.
Mr. Kevin J. Barcavage, one of plaintiff's supervisors and an employee of Reicon, testified that after the vessel arrived at the work site, Reicon placed matting on the deck for the crane to travel on and equipped the vessel with a container for the storage of tools. He also testified that shortly before plaintiff's accident, he saw hydraulic fluid on the deck of the vessel and a hydraulic saw a few feet away from where plaintiff was standing. Just minutes before his accident, plaintiff had broken the couplings on the saw, which caused hydraulic fuel to spill onto the deck. After the spill, Mr. Barcavage saw plaintiff with rags in his hands, which plaintiff was about to use to clean the spill or which he had already used to clean it.
Despite Mr. Wollman's testimony that Reinauer turned the barge over to Reicon to apply the nonskid paint, in the court's view, a question of fact exists as to whether Mr. Wollman was acting for Reinauer, as opposed to Reicon, when the deck was painted, and thus whether Reinauer breached its duty to turn over the barge in a safe condition. In addition, even assuming Reinauer was plaintiff's employer, and thus a dual-capacity defendant, a question of fact exists as to whether Reinauer performed the painting of the deck in its capacity as vessel owner or employer.{**4 Misc 3d at 845}
Although Mr. Wollman testified that Reinauer turned over the barge to Reicon for Reicon's exclusive use, and that Reinauer had no further involvement with the barge but for transporting it to the work site, it is undisputed that the yard in which the barge was painted is located at the same address at which Reinauer is headquartered, suggesting Reinauer's involvement in the painting of the deck. Further, Mr. Wollman testified that the paint used could have been a stock paint provided by Reinauer. In addition, it appears that Mr. Wollman worked for both Reinauer and Reicon. In this regard, while Mr. Wollman asserts in his affidavit that "I am responsible for supervising and managing the day-to-day operations of Reicon's marine construction business," he also states that he is "a vice president of Reinauer Group, which includes defendants Reinauer and Reicon, as well as another corporation." Thus, a question is presented as to whether he was overseeing the painting of the barge deck in his capacity as vice-president for Reinauer or in his supervisory role as Reicon's construction manager, particularly since construction work had not yet begun on the barge; the barge was transported to the work site after the deck was painted; and Mr. Barcavage and plaintiff's expert each assert in separate affidavits that the painting of barge decks is a job customarily performed by the vessel owner and not by construction workers.
Notably, in support of their contention that they did not breach their turnover duty, defendants argue that to the extent plaintiff's claim is based upon the allegation that the nonskid additive was lacking, Reinauer may not be held liable since it was entitled to rely upon Mr. Wollman's expertise and experience as a marine construction contractor to discern that allegedly defective condition. Reinauer notes in this regard that Mr. Wollman testified that it was obvious that the deck of the barge had not been painted when Reinauer turned the barge over to Reicon. This argument is rejected. First, Mr. Wollman did not testify that he was able to determine whether non[*9]skid paint already applied was defective. More importantly, defendants' argument disregards plaintiff's main contention that it was Reinauer who performed the deck painting, and that defendants therefore breached the first component of Reinauer's turnover duty; namely, the failure to turn the barge over in a safe condition. Defendants also fail to respond to this argument in their reply, merely addressing the second component of the turnover duty, the duty to warn. Nor do defendants directly address plaintiff's {**4 Misc 3d at 846}other contention that Reinauer performed the painting. Although defendants assert in their reply that Reicon painted the deck, they do not address plaintiff's arguments regarding Mr. Wollman's dual status, the significance of the location of the yard in which the barge was painted, the timing of the painting, or the averments made by plaintiff's expert and Mr. Barcavage regarding a vessel owner's customary duty to paint the deck of the barge with nonskid paint.
Inasmuch as a question of fact exists as to whether Reinauer breached its turnover dutywhether it was acting as mere vessel owner or as a dual-capacity defendant in its vessel capacitythat branch of its motion to dismiss plaintiff's cause of action under section 905 (b) is denied (see Smith v Eastern Seaboard Pile Driving, Inc., 604 F2d 789 [2d Cir 1979] [in dual-capacity pre-Scindia case, wherein plaintiff diver drowned by repairing the vessel, court held vessel owner negligent under section 905 (b) because vessel owner failed to provide a rescue plan and did not arrange for the proper placement of emergency apparatus or provide a ladder]).
In addition, assuming that Reicon was acting as an agent for Reinauer when the deck was painted, a question of fact also exists as to whether Reinauer breached its corollary duty to warn the Reicon dock builders of the inadequacy of the deck covering. As noted, plaintiff's expert and Mr. Barcavage stated that it was customary for the vessel owner to provide the nonskid coating, which raises the question of whether Reicon, acting on behalf of Reinauer, had or should have had some familiarity with the process, including whether it was performed properly. In addition, plaintiff's expert opines that the nonskid additive must have sufficient "surface roughness," to engage the shoe bottom in a manner not unlike sandpaper, raising an issue as to whether Reicon, acting for Reinauer, should have noticed the surface roughness or lack thereof. In this regard, plaintiff's expert asserts that the application of a sand or grit based nonskid additive, which was applied to the deck, was improper because the nonskid additive did not provide adequate surface profile asperities, or rough places, that would sufficiently extend through the hydraulic oil, water and other debris to provide the necessary traction in the working areas of the barge platform. On the other hand, Mr. Barcavage testified that he had no problem with the manner in which the deck had been painted. Thus, an issue of fact exists as to whether the allegedly defective nonskid coating was "known to [Reinauer and/or Reicon] or should [have been] {**4 Misc 3d at 847}known to [them] in the exercise of reasonable care," thereby triggering the duty to warn (Howlett, 512 US at 98).
Plaintiff's claim that defendants breached the "active operations" duty, however, is not supported by the record. Once the barge was turned over for implementation of the pier rehabilitation project, the record is clear that the barge was used solely for dock building purposes performed by Reicon employee dock builders, and that it was never manned or used by Reinauer or Reicon as part of Reinauer's marine transportation business.
Finally, a question of fact also exists as to whether Reicon may be held liable for vessel negligence. In this regard, plaintiff properly notes that the record contains a "Certificate of Classification" indicating that Reicon was the owner of the barge on November 16, 2000, before the [*10]barge was turned over to the dock builders to commence the rehabilitation project. On the other hand, Mr. Wollman avers in his affidavit that Reinauer was the owner of the barge at the time of turnover, and he submits a "Certification of Documentation" indicating that Reinauer was the owner of the barge on September 21, 2000, also prior to the time when the barge was turned over to the dock builders at the Marine Transfer Station on January 12, 2001.
In sum, questions of fact exist as to whether Reinauer and Reicon breached their turnover duty, precluding dismissal of plaintiff's section 905 (b) claim.
Defendants also move to dismiss plaintiff's cause of action under Labor Law §§ 200, 240 (1) and § 241 (6) on the grounds that they are preempted by the LHWCA. Section 905 (b) provides, in pertinent part, that "[t]he remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this [act]." Defendants argue that in "dual-capacity" cases such as this case, where a plaintiff's employer is also the owner of the vessel where the injury occurred, the exclusivity provision of section 905 (a) bars an employee from bringing suit under section 905 (b) against a vessel owner acting in its capacity as employer. Defendants assert that since any negligence plaintiff attributes to them is as his employer, and not as vessel owner, the LHWCA benefits plaintiff received pursuant to section 905 (a) are his exclusive remedy, and that therefore plaintiff's state claims are preempted (see Minnick v United States, 767 F Supp 115, 118 [ED Va 1990]). Defendants also argue that to the extent plaintiff contends that this State's Labor Law applies because of Cammon{**4 Misc 3d at 848} v City of New York (95 NY2d 583 [2000]), plaintiff is incorrect because Cammon did not address whether the Labor Law is preempted by the statutory provisions of section 905 (b) since the defendant moving to dismiss the plaintiff's Labor Law causes of action in Cammon was not the "vessel" owner, and therefore was not sued under section 905 (b).
In opposition, plaintiff asserts that assuming Reinauer is neither his employer nor the barge owner, then Reinauer is not entitled to an employer's exclusive remedy protection under section 905 (a) or the limitations on suit set forth in section 905 (b). Under these circumstances, plaintiff contends that it may bring a negligence action against Reinauer under section 933 of the LHWCA which, according to Cammon v City of New York (95 NY2d 583 [2000]), permits him to bring his New York State Labor Law claims. In this regard, plaintiff asserts that as "nonemployer, nonshipowner," under this State's common law, a question of fact exists as to whether Reinauer created the condition by applying the allegedly defective paint in its yard.
But for arguing that Reicon painted the barge deck, defendants do not address this argument in their reply.[FN5]
[*11]
As noted above, a question of fact exists as to whether Reinauer or Reicon owned the barge when it was turned over. Moreover, there is a question of fact as to whether Reinauer was plaintiff's employer. In addition, the record reveals that plaintiff was involved in local land-based repair (see Cammon, 95 NY2d at 586, 590). Thus, assuming Reinauer is neither plaintiff's employer nor owner of the barge, plaintiff's Labor Law causes of action are not preempted (Cammon, 95 NY2d 583, 587-590 [2000] [plaintiff's New York Labor Law § 240 (1), § 241 (6) and § 200 claims against New York City, owner of a marine transfer station, and the general contractor, were not preempted by federal maritime law where plaintiff was injured while engaged in {**4 Misc 3d at 849}local land-based repair and received workers' compensation benefits under the LHWCA]). Notably, even defendants acknowledge that the plaintiff in Cammon sued the City, as well as the general contractor, who was not a land owner, neither of whom were covered under the LHWCA because neither were plaintiff's employer or vessel owner.
Applying the foregoing, while plaintiff may bring a Labor Law § 240 (1) cause of action, it is dismissed because plaintiff did not sustain a gravity-related injury. With respect to plaintiff's causes of action under section 241 (6) and section 200, as noted above, questions of fact exist as to whether Reinauer painted the deck of the barge with nonskid paint, and thus created the allegedly dangerous condition, and whether it violated the Industrial Code sections set forth in plaintiff's bill of particulars. Thus, assuming Reinauer qualifies as either a general contractor or an agent thereof, these causes of action are potentially viable (see Sabato v New York Life Ins. Co., 259 AD2d 535, 536-537 [1999] ["It is axiomatic that the statutory duties imposed by (Labor Law § 240 [1] and § 241 [6]) place ultimate responsibility for safety practices upon owners of the worksite and general contractors"]; Rizzuto v Wenger Contr. Co., 91 NY2d 343, 352 [1998] ["section 200 is a codification of the common-law duty imposed upon an owner or general contractor to maintain a safe construction site"]; Whalen v City of New York, 270 AD2d 340, 342 [2000] "[(i)t is well settled that Labor Law § 241 (6) imposes a nondelegable duty on owners and contractors . . ."]).
In sum, that branch of defendants' motion to dismiss plaintiff's cause of action under 33 USC § 905 (b) and § 933 is denied. That branch of the motion to dismiss plaintiff's Labor Law § 240 (1) cause of action is granted, and that branch of the motion to dismiss plaintiff's Labor Law §§ 200 and 241 (6) causes of action is denied.

Footnotes

Footnote 1: 33 USC § 905 (b) provides, in relevant part, that "[i]n the event of injury to a person covered under this [act] caused by the negligence of a vessel . . . such person . . . may bring an action against such vessel as a third party."

Footnote 2: It should be noted that in his opposition papers, plaintiff provides an earlier affidavit of Mr. Wollman, which was submitted in connection with a similar matter in which the court (Alice Schlesinger, J.) found that the plaintiff therein was an employee of both Reicon and Reinauer on the grounds that both corporations acted as a "solitary or singular unit." In this earlier affidavit, Mr. Wollman stated, inter alia, that Reicon was formed as a corporation in 1998 so that it could hire labor from a certain union for a particular contract which Reinauer was unable to do because of its collective bargaining agreement with a different labor union. Moreover, he stated that Reinauer owned 100% of the stock of Reicon. In spite of this affidavit, in the court's view, the evidence in the record fails to establish that Reinauer exercised complete dominion and control of Reicon's everyday operations such that Reinauer and Reicon may be considered a single entity.

Footnote 3: As to what constitutes vessel negligence, "[t]he Supreme Court has indicated that Congress left to the courts the task of defining the vessel's duty of care" (Morehead v Atkinson-Kiewit, J/V, 97 F3d 603, 609 [1996]; id. at 608, quoting Howlett v Birkdale Shipping Co., S.A., 512 US 92, 97-98 [1994] ["Because Congress did not 'specify the acts or omissions of the vessel that would constitute negligence,' the contours of a vessel's duty to longshore (workers) are 'left to be resolved through the "application of accepted principles of tort law and the ordinary process of litigation" ' "], citing Scindia Steam Nav. Co., Ltd. v De Los Santos, 451 US 156, 165-166).

Footnote 4: Plaintiff appears to concede that the last duty is not an issue in this case. In his memorandum of law, he asserts that "[i]n light of the active obligations failures[ ] discussed above, the duty to intervene is an irrelevance in this matter." 

Footnote 5: In correspondence, defendants have supplied the court with Emanuel v Sheridan Transp. Corp. (10 AD3d 46 [1st Dept 2004]), which held, inter alia, that the Supreme Court properly dismissed plaintiff's Labor Law § 240 (1) claim as preempted by federal maritime law, and in so finding, rejected the plaintiff's reliance upon Cammon because in Cammon, unlike the circumstances in Emanuel, defendant City owned and operated the marine transfer station, and the plaintiff was injured while performing "local land-based" repair. Defendants argue, inter alia, that plaintiff's Labor Law causes of action should similarly be preempted because plaintiff's injuries are not land-based and defendants are not landowners with respect to the place of the alleged accident. In a reply correspondence, plaintiff essentially reiterates the argument set forth immediately above, and argues that Emanuel is consistent with Cammon.